Filed 1/6/25  P. v. Byrne CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LOGAN MICHAEL BYRNE,<br><br>Defendant and Appellant. | C097334<br><br>(Super. Ct. No. F20000086)<br><br>MODIFICATION OF OPINION AND DENIAL OF PETITION FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

Appellant filed a petition for rehearing with this court.  It is hereby ordered that the petition for rehearing is denied.

It is also ordered that the opinion filed herein on December 6, 2024, be modified as follows:

1

1.      On page 17, the second full paragraph is to be deleted and replaced with a new paragraph.  The paragraph currently reads:

To be entitled to reversal on this ground, a defendant must " 'establish by a preponderance of the evidence that perjured testimony was adduced at his trial, that representatives of the state knew that it was perjured [citations], and that such testimony may have affected the outcome of the trial.' " (*People v. Gordon* (1973) 10 Cal.3d 460, 473, disapproved on another ground by *People v. Ward* (2005) 36 Cal.4th 186, 212.)

2.      The replacement paragraph on page 17 should now read as follows:

To be entitled to reversal on this ground, a defendant must establish by a preponderance of the evidence that perjured testimony was presented and that the testimony may have affected the outcome of the trial.  (See *People v. Marshall* (1996) 13 Cal.4th 799, 829-830 [explaining current standard of review].)

This modification does not change the judgment.

FOR THE COURT:

_____/s/_____
Hull, Acting P. J.

_____/s/_____
Duarte, J.

_____/s/_____
Renner, J.

2

Filed 12/6/24  P. v. Byrne CA3 (unmodified opinion)

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LOGAN MICHAEL BYRNE,<br><br>Defendant and Appellant. | C097334<br><br>(Super. Ct. No. F20000086) |

In January 2019, 17-year-old Bailey was drinking alcohol at S.G.'s house. Defendant Logan Michael Byrne lived at the house, and S.G. lived with him part-time. After consuming two mixed drinks made by defendant, Bailey vomited and fell asleep on the couch. When she awoke, defendant was lying next to her, and he digitally penetrated her vagina on three occasions. Defendant was convicted of sexual penetration by a foreign object by means of force, violence, duress, menace, or fear of immediate and

1

unlawful bodily injury (Pen. Code, § 289, subd. (a)(1); count I)[1] (sexual assault or assault) and contributing to the delinquency of a minor (§ 272, subd. (a)(1); count II).

On appeal, defendant contends: (1) substantial evidence does not support the finding that he used force, violence, duress, menace, or fear of bodily injury when assaulting Bailey; (2) the prosecutor committed prejudicial misconduct by failing to correct what defendant characterizes as Bailey's false testimony, by contributing to the error during her summation, and by failing to disclose material evidence in violation of *Brady v. Maryland* (1963) 373 U.S. 83; (3) the prosecutor violated his right to counsel by commenting on his phone call to and meeting with his father--an attorney who represented him at trial and currently represents him on appeal--in the hours after the assault; (4) the prosecutor committed pervasive misconduct throughout trial; (5) the trial court abused its discretion by excusing Bailey after cross-examination and erred by concluding Bailey was immune from service of a defense subpoena seeking to recall her for further cross-examination; (6) the court abused its discretion by admitting DNA evidence; and (7) the court erred by failing to instruct the jury on lesser included crimes.

We agree the trial court erred when it concluded Bailey was immune from service of process of a defense subpoena, but conclude the error was harmless. Defendant's other claims fail to establish error. We will affirm the judgment.

**FACTS AND PROCEEDINGS**

*Bailey's Testimony*

Bailey testified at trial. On January 13, 2019, she was 17 years old, and was a junior in high school. At that time she was best friends with S.G., who was defendant's stepdaughter. Bailey trusted defendant, who was a father figure to her. Before the assault, there were no issues between Bailey and defendant.

---

[1] Further undesignated statutory references are to the Penal Code.

S.G. lived part-time at defendant's house, and Bailey went to the house multiple times a week to spend time with S.G. Occasionally, other friends joined them at the house. On at least five occasions defendant provided the teens with alcohol, and he also provided marijuana, although Bailey did not smoke marijuana. Defendant occasionally drank with them, but most times he would be working. They would drink "hard seltzers" and "cans," and occasionally defendant made them mixed drinks. Other than using hard alcohol, Bailey did not know what defendant put in the drinks he made. Bailey never got overly intoxicated, only "tipsy."[2] Defendant encouraged them to drink more than they did.

On January 12, 2019, Bailey went to defendant's house to hang out with S.G. after sports. She wore shorts, underwear, and a T-shirt. The shorts had a liner that went over her underwear. Defendant made the girls "Moscow Mules" around 11:00 p.m., and then insisted on making them another one.[3] Defendant insisted that she have a "certain one" of the second round of drinks. Bailey did not know what kind of alcohol was in the drinks, although she was aware they contained ginger beer, and she did not watch defendant make the drinks. She never asked defendant how to make a Moscow Mule, and she did not make the second drink herself.

They stopped drinking after the second drink; between 12:00 a.m. and 1:00 a.m. Bailey went to the bathroom and vomited, blacked out, and fell asleep on the couch. Other than feeling intoxicated to the point of having to vomit, Bailey felt "[n]ot there," and that she was "just in and out of blackness" before waking up on the couch. Bailey and S.G. were sitting on a large, L-shaped sectional couch in the living room while they

---

[2] Doe defined "tipsy" as being "coherent" and as "hav[ing] control over what you're doing, but you still feel the alcohol."

[3] Defendant testified the drink contains one ounce of vodka, and ginger beer and lime to taste.

were drinking. S.G. was lying on the right side of the couch, with her head on the armrest and her body laid out along the couch, and Bailey fell asleep with her head in the center of the couch, with her feet over the armrest.

When Bailey woke up, she was still lying on her side on the couch with her back against the couch cushion, and her feet toward the armrest. Defendant was lying next to her, facing her but positioned the same way as she was. She felt defendant's facial hair between her neck and chin, and his legs were touching hers. In response to the prosecutor's question of whether defendant's body was on top of hers, Bailey testified that his body was "leaning." She agreed defendant was bigger than her. S.G. was lying on the other side of the couch.

Defendant's left hand was in her shorts, and his finger was inside her vagina. Bailey testified that defendant put his fingers inside of her vagina three separate times. Between incidents defendant left his hand inside her shorts, and Bailey unsuccessfully tried to get defendant off her. She pretended to be sleeping, and she tried to move or adjust her body for about 20 seconds as if she were sleeping or were beginning to wake up. However, she could not move because there was "not much movement area." She did not tell him to stop because she felt scared, she did not try to push his hand away with her hand, and she did not yell or scream. She did not feel free to move because she was afraid she would get hurt if she did. Defendant did not say anything during the assault. Defendant also put his hand up her shirt and touched her breasts under her bra "at one point."

Bailey was not sure how much time elapsed between the discrete incidents because she was "going in and out of consciousness" and was "dozing on and off" for "a moment or two" or "a minute to a couple minutes." She then testified that it "could have been just a couple of moments" or "a few moments, but it wasn't long." She acknowledged that she would never have a clear recollection of what happened that night because she was "not fully conscious during most of it" and was "going in and out." She

4

explained that "[m]ost people when they wake up around [2:00 a.m. and 3:00 a.m.] aren't fully operating brain wise. They are, you are going to be a little hazy and sometimes you fall in and out of sleep."

Defendant eventually got up and left the room. After making sure he was gone, Bailey grabbed her belongings and went home. She recognized that she should not have driven home the night of the assault, but she was able to drive because she was "coming more to" from the moment she woke up at the beginning of the assault. After the assault, Bailey experienced burning in her vaginal area.

S.G. called Bailey while she was on her way home to ask where she had gone. Bailey told her what defendant did. When she got home around 3:00 a.m., Bailey woke up her parents and told them about the assault.[4] Bailey's parents contacted the police. Bailey filed a restraining order against defendant because she did not feel safe around him anymore. Bailey was 100 percent certain defendant sexually assaulted her that night.

Bailey wanted to be in a sexual relationship with a classmate J. but they were never in one. They only kissed and might have hugged.

During cross-examination, defense counsel asked Bailey whether she "believe[d] [defendant] placed anything in your drink that would be considered a roofie."[5] Bailey responded, "I wouldn't put it past him." She also authenticated a video on cross-examination in which, according to defendant, Bailey stated that she was "roofied."[6]

---

[4] Doe's mother testified that Doe admitted drinking that night, but she appeared "very calm" and "in shock," not drunk or intoxicated.

[5] "Roofie" is a slang term for the drug Rohypnol. It is a benzodiazepine that produces a sedative-hypnotic effect, and is commonly referred to as a "date rape" drug.

[6] Neither the video nor the transcript thereof appears in the record.

5

*Investigation*

Detective Josephine Strachan responded to Bailey's house to investigate the report at approximately 5:00 a.m. on January 13. Bailey told Strachan about the assault and identified defendant as the person who assaulted her. Bailey appeared reserved and a little confused or apprehensive, but she did not appear to be under the influence of any kind of substance--which Strachan clarified to mean that she did not smell any alcohol or other narcotics on Bailey. Strachan did not recall Bailey telling her that defendant pushed her to have a second drink, that he gave her a specific glass, that she vomited, or that she believed she was "roofied."

Strachan searched defendant's home the afternoon after the assault. She interviewed S.G., who pointed out three mason jars that she said were used to drink alcohol the previous night. The jars were in the kitchen sink along with other dirty dishes, and they did not appear to have been washed. Strachan observed bottles of liquor in the kitchen and ginger beer in the refrigerator, but she did not discover any drugs or narcotics. There were empty ginger beer bottles in the garbage.

Several hours after the assault, Bailey agreed to undergo a sexual assault examination (SART). Stephanie Bareis, the physician's assistant who performed the exam, testified that Bailey did not appear to be under the influence of drugs or alcohol, and she did not assert that she had been drugged. Bailey said she had urinated and defecated between the assault and the exam, and wiping could have inadvertently wiped away evidence left behind after the assault. Bailey denied any genital injuries in the 14 days before the exam, denied having recent sexual contact with anyone other than defendant, and said she experienced pain during and immediately after the assault. Bareis observed that Bailey had labial injuries consistent with her report of being sexually assaulted, although she could not determine whether the injuries resulted from consensual sex or assault.

Bailey told Bareis that the assault took place from 1:00 a.m. until 4:15 a.m., that she was conscious for its duration, and that defendant had physically restrained her with his body weight.

Defendant also underwent a SART exam; he acknowledged during the exam that he had urinated and showered before the exam.

*Y-STR DNA Evidence*

Y-chromosome short tandem repeat (Y-STR) DNA testing looks at only the Y chromosome, or male portion of DNA, at multiple parts of a very specific location. Y-STR DNA testing is used where there is a mixed sample of DNA that has a low level of male DNA relative to female DNA. Using this method, analysts can ignore the female DNA and focus on the male DNA in the mixed sample. A DNA profile at the Y-chromosome is referred to as a haplotype, which is inherited as a unit from the father. Unlike "regular," or autosomal DNA testing, which is unique from person to person, a son will have the same inherited haplotype as his father and other men in the same patrilineal lineage.[7] Thus, barring a mutation, a grandfather, father, uncle, and brothers will share a haplotype.

Under the Y-STR DNA testing method, an analyst obtains DNA from a reference sample and compares it to the DNA from collected evidence to determine if the person who provided the reference sample could have contributed to the DNA observed in the evidence sample. If the haplotype from the reference sample is consistent with the haplotype from the evidence sample, the person who provided the reference sample cannot be excluded as a contributor to the evidence sample.

---

[7] Patrilineal lineage means "[f]rom father to son."

In this case, Department of Justice senior criminalist Shavonne Sicher performed Y-STR DNA testing on Bailey's underwear and shorts because there was a low amount of male DNA in relation to the total amount of DNA found.

Two male contributors were found on the interior crotch of Bailey's underwear, and defendant could not be excluded as the source of the major haplotype. An indistinguishable mixture of DNA from three males was found on the underwear's waistband, and Sicher could not determine who could have contributed to that sample. A mixture of at least two males was obtained from a swab of the interior crotch of Bailey's shorts, and defendant could not be excluded as the source of the major haplotype. There was a mixture of DNA from at least one major and two minor male contributors on the exterior front waistband and front area of the shorts, and defendant could not be excluded as a source of the major haplotype.[8] Defendant's haplotype was observed five times in 8,483 haplotypes in the Caucasian Y-chromosome reference database, meaning it would be expected to occur in no more than approximately one in 807 Caucasians.

Bailey's breasts and neck were swabbed, but defendant was excluded as a possible contributor to the DNA mixture found on Bailey's breasts and the right side of Bailey's neck. The DNA mixture from the left side of her neck was too complex for interpretation, and therefore no conclusion was drawn.

DNA testing was also conducted on defendant's fingernail scrapings. Sicher testified that if a perpetrator digitally penetrated a victim, and the fingernails scrape along the lining of the vagina, it would be possible to find the victim's DNA under the perpetrator's fingernails. However, it is also possible that the victim's DNA would not be found. Washing their hands, cleaning under the fingernails, scrubbing, and improper

---

[8] Sicher also tested a vulvar swab, vaginal swab, and a perianal swab collected from Doe, but Sicher did not obtain results for those swabs because they included either no male DNA or only trace amounts of male DNA.

8

collection of DNA can contribute to a lack of DNA. Any type of handwashing creates a good chance that the DNA is going to be eliminated or diminished.

In defendant's fingernail scrapings, there was a mixture of a major male DNA contributor and at least one minor contributor. The major profile matched defendant, but the sample was not suitable to determine the minor contributor. No foreign DNA was detected from a scratch on defendant's chest.

*Defense Evidence*

S.G. testified that Bailey initiated the drinking on the night of the assault. Defendant was drinking Moscow Mules, and he complied with Bailey's request that he show her and S.G. how to make them. Bailey was with defendant when he made the first drinks for her and S.G., but S.G. was not sure whether Bailey made the second round of drinks alone, or with defendant's help.

After the second drink, Bailey was feeling the urge to vomit; defendant gave her a piece of gum. Despite defendant's attempt to help, Bailey went to the bathroom and vomited. Bailey then said she was feeling better, and they continued to watch a movie on the couch. Defendant joined them on the couch during the movie. S.G. testified that they talked about what Bailey did that day, and Bailey said that J. had performed oral sex on her that day. S.G. recalled that Bailey was "pretty upbeat" and "seemed pretty okay honestly" after vomiting.

Bailey fell asleep first, then defendant, and then S.G. When S.G. woke up, defendant was walking down the hall, asking her why they were opening the door. S.G. realized Bailey was not there, and she called Bailey to see where she went and if she was okay. Bailey answered the phone crying and told S.G. defendant "fingered" or touched her. The phone disconnected; S.G. called Bailey back, but Bailey did not answer. S.G. was in disbelief and told defendant what Bailey told her. Defendant was taken aback, and denied the allegations. After that, S.G. and defendant talked about what happened before going back to sleep.

9

During S.G.'s testimony, defense counsel asked her if defendant called anyone after the assault; S.G. responded that defendant called his father, adding that his father "is the man sitting beside him over there."

Doctor Monte Miller is a forensic expert who reviewed the case file. He testified there is a potential for DNA transfer when around others, and it is typical that people sharing an environment will have each other's DNA on them. He would expect that a significant amount of DNA from a finger that penetrated a vagina would be found in the vagina for 24 to 36 hours, but it is possible that not a lot would be found, and after 18 hours the biological activity of the vagina would absorb and degrade the DNA. Underwear is typically the best place to find evidence to test because if DNA was originally in the vagina, it will likely end up on the underwear, where it will last longer.

With respect to DNA under a person's fingernails, one study showed that after handwashing 20 to 30 times following digital penetration, DNA of the person who was penetrated was still found under the fingernails of the person who performed the act. Based on the information he reviewed, Dr. Miller believed it to be relatively certain that Bailey's DNA would have been found under defendant's fingernails had he digitally penetrated her as she claimed. Dr. Miller would have also expected defendant's DNA to be found on Bailey's neck if he were close enough to her that she felt his breath, although the DNA could have been removed if she wiped her neck or changed her shirt.

Minh Tran, a forensic toxicologist, tested three mason jars found at defendant's house that were allegedly used to consume alcohol the night of the assault. Tran did not locate any elicit substances or over-the-counter drugs in the jars. Tran agreed that any drugs may have been washed off the glass if it were rinsed or washed before being tested.

*Defendant's Testimony*

Defendant testified that he was drinking alcohol by himself on the night of the alleged assault. He made Bailey and S.G. Moscow Mules after they asked him if they could have a drink. Bailey watched defendant make the drink to learn how to make one,

10

and she made the second round of drinks herself. He never went out of his way to give Bailey a specific glass, and he did not put any drugs in the glass.

Defendant recalled giving Bailey a piece of gum, and was told that Bailey had vomited after he did so. Bailey fell asleep on the couch first, and then defendant. When defendant woke up, Bailey was behind him with her leg over his legs, which caused him to be scared and freaked out. He pushed her leg off him and went to his room to go back to sleep. He awoke to an alert on his phone that the door had been unlocked. He went to the living room to see what was going on and saw Bailey was gone. He woke up S.G. to find out if she knew where Bailey went, and he asked S.G. to call Bailey. When S.G. told him about Bailey's accusations against him, he was shocked, confused, and scared.

Defendant called his father. He and his father met later that morning to discuss what had happened. During her cross-examination of defendant, the prosecutor elicited that his father was one of his defense attorneys and was a former prosecutor. Defendant and his father went to the pet store without his children; they talked about what happened the night before and were gone for about 30 to 45 minutes. His father advised him to request for a lawyer when the police arrived at his house. Defendant knew the police would contact him because Bailey would tell her parents and law enforcement would act on a report.

*Procedural Background*

A jury found defendant guilty of sexual penetration by a foreign object by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury (§ 289, subd. (a)(1); count I) and contributing to the delinquency of a minor (§ 272, subd. (a)(1); count II). The trial court sentenced defendant to the middle term of six years for count I and a concurrent term of 60 days for count II.

Defendant timely appealed. The case was fully briefed in July 2024 and was assigned to the current panel at the end of that month.

11

# DISCUSSION

## I

### *Insufficient Evidence Claim*

Defendant contends there is no substantial evidence that he used force, violence, duress, menace, or fear of bodily injury when committing sexual penetration. We disagree.

A. *Standard of Review*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)

Under the substantial evidence standard, " '[w]e do not reweigh evidence or reevaluate a witness's credibility.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.) "[A] reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181; see *People v. Maury* (2003) 30 Cal.4th 342, 403 ["Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends"].) If the circumstances reasonably justify the jury's findings, the judgment may not be reversed

12

simply because the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Jennings* (2010) 50 Cal.4th 616, 639.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

B. *Analysis*

Section 289, subdivision (a)(1)(A) punishes "an act of sexual penetration when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." The trial court instructed the jury with CALCRIM No. 1045, which provided in part: "An act is accomplished by force if a person uses enough physical force to overcome the other person's will. [¶] Duress means a direct or implied threat of force, violence, danger, hardship or retribution that is enough to cause a reasonable person of ordinary sensitivity to do or submit to something that she would not otherwise do or submit to. When deciding whether the act was accomplished by duress, consider all of the circumstances including the age of the other person and relationship to the Defendant. [¶] Menace means a threat, statement or act showing an intent to injure someone. [¶] An act is accomplished by fear if the other person is actually and reasonably afraid or she is actually but unreasonably afraid and the defendant knows of her fear and takes advantage of it."[9] At trial, the prosecutor argued theories of force, duress, and menace.

The language of the subdivision uses the words "force," "violence," "duress," "menace," or "fear" in the disjunctive, and therefore a conviction will be affirmed if there is substantial evidence that a sexual act was accomplished by any of the means stated in the statute. (*People v. Hale* (2012) 204 Cal.App.4th 961, 976.)

---

[9] The court also instructed the jury that the crime required specific intent. (CALCRIM No. 252.)

13

To complete the crime by means of force, there is no requirement that the defendant apply force "substantially different from or substantially greater than that required to complete the sexual act." (*People v. McCann* (2019) 41 Cal.App.5th 149, 157; *In re Asencio* (2008) 166 Cal.App.4th 1195, 1205.)

Here, there is substantial evidence to support the finding that defendant used force to accomplish sexual penetration against Bailey's will. Bailey testified that she was leaning back against the couch cushion, defendant's body was leaning against hers, and she was not able to move between each discrete incidence of penetration because there was nowhere for her to go. There was no evidence Bailey wanted to be penetrated, and no evidence establishing her cooperation by act or attitude. Even if defendant did not lie down on top of her, he exercised force by leaning against her, effectively securing her in place and preventing her from moving.

Defendant's arguments to the contrary are unpersuasive. First, he argues that he did not use force because he stopped penetrating her vagina each time she moved, and then left the room after the third instance of penetration. That interpretation is not supported by the evidence. Bailey testified that she *tried* to move *after* each instance of penetration, but she was unable to move because there was no space to do so, and she was not able to get him off her by moving. She noted that although she tried to move her body as if she were sleeping, "it didn't do anything."

Second, defendant argues that he had no reason to use force because he did not know Bailey was awake, or that she was aware of what he was doing. There was no evidence regarding his subjective belief of whether he needed to use force to overcome Bailey's will. Defendant testified that no sexual contact occurred. Bailey testified that she pretended to be asleep during the incident, but it does not necessarily follow that defendant did not use force to accomplish his crime.

Third, defendant argues the evidence does not support the Attorney General's characterization that Bailey was "pinned" against the couch because that term does not

appear in the record, and because Bailey was able to move her body. But as we have discussed, substantial evidence supports the finding that Bailey's back was against the back couch cushion, defendant was leaning against her body, and Bailey was both afraid and unable to move.

Finally, defendant argues there was no substantial evidence of force used prior to the first instance of penetration because Bailey testified that his finger was penetrating her vagina when she awoke, and no substantial evidence of force used to accomplish the second and third instances because Bailey dozed off between instances of penetration, obviating the need for force. We agree that Bailey testified to being asleep at the time defendant initiated the first instance of penetration. But the same is not true for the second and third instances. Bailey testified that she "dozed off" between each incident-- which she distinguished from "fall[ing] asleep"--and she did not testify that she was asleep at the time the second and third acts were initiated. As we have discussed, substantial evidence supports the findings that defendant leaned against Bailey's body to the point where she was unable to move, he penetrated her vagina with his finger on three separate occasions, and he left his hands in her shorts between incidents. Although a reasonable finder of fact may have found otherwise, that is not the test, as we have described *ante*. Thus, substantial evidence supports the finding that defendant used force throughout the encounter, even if Bailey "dozed off" at times.

II

*Prosecutorial Error and* Brady *Claim*

Defendant contends the prosecutor committed prejudicial misconduct by failing to correct what he characterizes as Bailey's false testimony that he drugged her, despite the prosecutor's admission outside the presence of the jury that there was no evidence he did. He further argues that the prosecutor contributed to the error by arguing during closing that he drugged Bailey.

15

Additionally, defendant argues the prosecutor committed a *Brady* violation by failing to disclose to him Bailey's statement to law enforcement that she believed he drugged her.

As we will explain, we disagree.

A. *Legal Background*

"What is crucial to a claim of prosecutorial misconduct is not the good faith *vel non* of the prosecutor, but the potential injury to the defendant." (*People v. Benson* (1990) 52 Cal.3d 754, 793.) "Under the federal standard, prosecutorial misconduct that infects the trial with such ' "unfairness as to make the resulting conviction a denial of due process" ' is reversible error. [Citation.] In contrast, under our state law, prosecutorial misconduct is reversible error where the prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the jury' [citation] and ' "it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." ' " (*People v. Martinez* (2010) 47 Cal.4th 911, 955.)

" 'Under well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the evidence it presents.' " (*People v. Harrison* (2005) 35 Cal.4th 208, 242.) "Put another way, the prosecution has the duty to correct the testimony of its own witnesses that it knows, or should know, is false or misleading. [Citation.] This obligation applies to testimony whose false or misleading character would be evident in light of information known to the police involved in the criminal prosecution [citation], and applies even if the false or misleading testimony goes only to witness credibility [citations]. Due process also bars a prosecutor's knowing presentation of false or misleading argument. [Citations.] . . . '[A] prosecutor's knowing use of false evidence or argument to obtain a criminal conviction or sentence deprives the defendant of due process.' " (*People v. Morrison* (2004) 34 Cal.4th 698, 716-717.)

16

However, mere inconsistencies between a witness's testimony and her prior statements do not prove the falsity of the testimony. (*People v. Vines* (2011) 51 Cal.4th 830, 874-875.) "When . . . the prosecution has doubts as to the truth of a statement it intends to present at trial, it must disclose to the defense any material evidence suggesting that the statement in question is false. But, notwithstanding those doubts, the prosecutor may still present the statement to the jury." (*People v. Harrison*, *supra*, 35 Cal.4th at p. 242; see *People v. Seaton* (2001) 26 Cal.4th 598, 648 ["So long as the prosecutor's doubts are *based solely on the evidence presented at trial*, the jury is capable of deciding which of the competing experts is the more convincing . . ."].)

To be entitled to reversal on this ground, a defendant must " 'establish by a preponderance of the evidence that perjured testimony was adduced at his trial, that representatives of the state knew that it was perjured [citations], and that such testimony may have affected the outcome of the trial.' " (*People v. Gordon* (1973) 10 Cal.3d 460, 473, disapproved on another ground by *People v. Ward* (2005) 36 Cal.4th 186, 212.)

When the defendant's claim of prosecutorial misconduct "focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) Courts give a prosecutor "wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence." (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.) "Whether the inferences the prosecutor draws are reasonable is for the jury to decide." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) Due process "bars a prosecutor's knowing presentation of false or misleading argument. [Citations.] As we recently summarized, 'a prosecutor's knowing use of false evidence or argument to obtain a criminal conviction or sentence deprives the defendant of due process.' " (*People v. Morrison*, *supra*, 34 Cal.4th at p. 717.)

17

B. *Bailey's Trial Testimony*

We first turn to defendant's claim that the prosecutor committed prejudicial misconduct by failing to correct what he characterizes as Bailey's false testimony that he drugged her before the assault. He contends the prosecution "presented the drugged story through Bailey's testimony," including that he provided her with a "certain drink," that she was going in and out of consciousness, that she blacked out, and that she should not have driven home after the assault. He adds that Bailey's perjured testimony was necessary to support her improbable assertion--made during her SART exam--that the assault occurred from 1:00 a.m. until 4:00 a.m.

We disagree that Bailey's testimony amounted to false testimony that she was drugged. Initially, while Bailey said during her SART exam that the assault took place over three hours, she testified at trial that only a few minutes elapsed between all three instances of penetration. Accordingly, we disagree with defendant's assertion that Bailey alleged she was drugged to explain how she could have been incapacitated for three hours because that was not her testimony.

Moreover, Bailey's testimony about her experience on the night of the assault did not amount to perjured testimony that she was drugged. Defendant argues there was no reasonable explanation for Bailey's testimony that he gave her a "certain one" of the drinks other than to assert that he drugged her, adding there is no reasonable inference that her drink contained " 'extra alcohol' " because Bailey testified that she did not feel intoxicated. We disagree. It is reasonable to infer from Bailey's testimony that defendant poured extra alcohol in the second drink. Indeed, it is undisputed that Bailey went to the bathroom and vomited after consuming two mixed drinks. S.G. agreed with the prosecutor's question that Bailey "wasn't feeling sober after she drank those two Moscow Mules," and testified that "[s]he was feeling sick." Defendant recalled giving Bailey a piece of gum, and he was told after she vomited that she had done so. To support his assertion that Bailey was not intoxicated, defendant points to a page in the

18

record in which the prosecutor asked her: "How did alcohol make you feel *other than intoxicated to the point where you had to throw up*?" (Italics added.) Bailey responded: "Not there. I didn't really feel anything after throwing up. I was just in and out of blackness, and then I woke up on the couch." Bailey did not testify that she did not feel intoxicated.

Bailey's other testimony did not amount to false testimony that she was drugged. She testified that she was "going in and out of consciousness," but she explained that she was disoriented because the assault occurred in the early morning hours, and "[m]ost people when they wake up around then aren't fully operating brain wise. They are, you are going to be a little hazy and sometimes you fall in and out of sleep." While Bailey testified that she did not "think [she] should have driven home that night," that was in response to defense counsel's question: "So you suddenly woke up and were able to drive home?" Bailey clarified that she did not "suddenly wake up," but that she was "coming more to." In other words, Bailey's testimony was in response to defense counsel's suggestion that Bailey would not have been able to drive home had she just woken up and had been going in and out of consciousness, as she testified.

During cross-examination, defense counsel pointedly asked Bailey whether she "believe[d] [defendant] placed anything in your drink that would be considered a roofie." Bailey responded, "I wouldn't put it past him." As with Bailey's testimony that defendant provided her with a "certain one" of the drinks, this testimony did not assert as fact that defendant drugged her, nor did it suggest there was physical evidence to support such a claim. Instead, Bailey's testimony amounted only to a statement of her belief about defendant's character.

Defense counsel then presented a video Bailey had previously posted on social media. On appeal, defendant asserts that Bailey stated in the video that he drugged her. But neither the video or a transcript thereof was made a part of the record on appeal, and therefore we cannot say that anything contained in that video was verifiably false.

19

C. *Prosecutor's Closing Argument*

Defendant contends the prosecutor contributed to the error of false testimony during her closing argument when she stated: "[Bailey] gets sick. . . . She gets sick and she ends up throwing up. . . . [¶] . . . She had consumed alcohol in the past, so when we think about this young lady up there speculating was I roofied, was I not roofied, we're not arguing she was roofied. That is not the theory of the prosecution, but this young lady has had time over the past two, three years to try to figure out what happened to her that night that put her in such a vulnerable position. [¶] [W]e all have different tolerance levels, but it is a little unusual that she has a couple of these Moscow Mules. [¶] They are not long island ice teas with every kind of alcohol you can think of in there. She ends up throwing up and getting very, very sick."

Defendant summarizes the prosecutor's argument as follows: " 'We aren't saying she was roofied, but do you really think she went in and out of consciousness for three hours without being roofied?' " We do not agree with that characterization. As we have discussed, Bailey did not testify at trial that she went in and out of consciousness for three hours, but rather that the time between each instance of penetration was mere minutes. Additionally, the defense, not the prosecution, raised the issue of Bailey being drugged. The prosecutor's comment noted the uncontested and unusual fact that Bailey vomited after consuming only two drinks and recognized--based on testimony elicited by defendant--that this unusual circumstance caused Bailey to speculate about what happened to her. In our view, the prosecutor's comment was not an invitation to the jury to find that defendant had drugged Bailey, but rather a comment about Bailey's state of mind following the assault in response to defendant's cross-examination.

D. *Alleged Failure to Disclose Favorable and Material Information*

Pointing to Bailey's testimony at trial that she told law enforcement during "one of the interviews" that she believed defendant had drugged her, defendant claims the prosecution committed a *Brady* violation by suppressing that material and then presenting

a story at trial based on hidden evidence.  He argues the prosecution's suppression of the material affected his trial strategy, which would have been different had the material been disclosed.

*Brady* and its progeny generally obligate the prosecution to disclose to the defense information that is " 'favorable to the accused' and is 'material' on the issue of either guilt or punishment."  (*City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 7.)  The state has a duty to disclose such evidence even where there has been no request by the accused.  (*United States v. Agurs* (1976) 427 U.S. 97, 107; *People v. Salazar* (2005) 35 Cal.4th 1031, 1042.)  " 'The scope of [the prosecution's] disclosure obligation extends beyond the contents of the prosecutor's case file and encompasses the duty to ascertain as well as divulge "any favorable evidence known to the others acting on the government's behalf." ' "  (*People v. Williams* (2013) 58 Cal.4th 197, 256.)

" 'For *Brady* purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness.' [Citation.]  '[The] touchstone of materiality is a "reasonable probability" of a different result . . . .  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." ' [Citation.]  In determining whether evidence is material under this standard, we consider ' "the effect of the nondisclosure on defense investigations and trial strategies." ' "  (*People v. Williams*, *supra*, 58 Cal.4th at p. 256.)  Such a reasonable probability is "assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract. [Citation.]  Further, it is a probability that is, as it were, 'objective,' based on an 'assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision,' and not dependent on the

'idiosyncra[s]ies of the particular decisionmaker,' including the 'possibility of arbitrariness, whimsy, caprice, "nullification," and the like.' " (*In re Sassounian* (1995) 9 Cal.4th 535, 544.) Materiality does not entail a substantial evidence analysis, and defendant does not have to demonstrate a reasonable probability of a different verdict had the suppressed evidence been disclosed to the defense. (*Kyles v. Whitley* (1995) 514 U.S. 419, 434-435; *Williams*, at p. 256.) If constitutional error is evident, "there is no need for further harmless-error review. [Citation.] The one subsumes the other." (*People v. Stewart* (2020) 55 Cal.App.5th 755, 778.)

Defendant asserts that he based his trial strategy on defending against Bailey's "improbable" assertion, made during her SART exam, that the assault lasted three to four hours. He argues that he would have retained additional experts had he been notified of Bailey's allegation that she was drugged.

Initially, we observe that defendant *was* aware of Bailey's allegation that she had been drugged well before the beginning of trial. On January 6, 2022, nearly seven months before the beginning of trial, defendant requested that the prosecution test the mason jars allegedly used for the drinks on the night of the assault after the defense had learned about Bailey's video, posted on social media, in which she purportedly asserted that she had been drugged. The prosecution declined to have the mugs tested, noting that it was not planning to proceed on the theory that Bailey was drugged, and therefore defendant had the mugs tested on April 10, 2022. In other words, at the time trial began on August 3, 2022, defendant had been aware of Bailey's social media video for at least seven months.

Additionally, the record does not demonstrate that Bailey made any statement to law enforcement about being drugged before defendant independently became aware of Bailey's social media video. At trial, the prosecutor confirmed that the "roofie issue" was not in any of the police reports, and that she had no personal knowledge that Bailey had made such statements. Indeed, at the hearing on defendant's motion to dismiss,

22

defense counsel stated: "If I can be a hundred percent frank, I think [the prosecutor] was caught off guard. I think when the roofie stuff came in, she just rolled with it because she hadn't heard of it, either." The only testimony about Bailey's statements came from Bailey, who testified when asked by defense counsel during cross-examination that she told law enforcement that she had been roofied "in one of the interviews."[10] She was not asked for, and did not provide, additional details.

Accordingly, because defendant was aware of Bailey's allegation well in advance of trial, even retaining an expert witness to discredit it, we are not persuaded that defendant would have changed his trial strategy had he been notified of Bailey's allegation by the prosecution. There was no *Brady* violation.

### III

### *Right to Counsel Claim*

Defendant contends the prosecutor committed prejudicial misconduct, violating his right to due process, by improperly penalizing his exercise of his right to counsel, both in her cross-examination of him and during closing argument. Defendant has failed to preserve this claim.

A. *Background*

In all criminal prosecutions, the accused shall enjoy the right to have the assistance of counsel for his or her defense. (U.S. Const., 6th Amend.; Cal. Const., art. 1, § 15.) It is improper for a prosecutor to infer guilt from a defendant's consultation with an attorney. (See, e.g., *Bruno v. Rushen* (9th Cir. 1983) 721 F.2d 1193, 1194 ["in no situation in a criminal trial . . . do we feel the mere act of hiring an attorney is probative in the least of the guilt or innocence of defendants"]; *United States ex rel. Macon v.*

---

[10] On appeal, defendant does not claim that Doe's testimony was false testimony requiring correction by the prosecutor.

23

*Yeager* (3d Cir. 1973) 476 F.2d 613, 614 [prosecutor's use of a pre-arrest, pre-*Miranda*[11] consultation with an attorney to infer guilt violated defendant's right to counsel].)

Here, defense counsel first elicited testimony about defendant's call to his father; S.G. testified about the call and added that defendant's father was sitting next to him at trial--implying that defendant's father was one of his attorneys. Defendant also testified on direct about his call to his father and their subsequent meeting. During cross-examination, the prosecutor elicited defendant's testimony that his father told him to request a lawyer when the police arrived.

During her summation, the prosecutor addressed the results of the test of the mason jars that were used on the night of the incident. She observed that the expert who tested the mason jars was not able to testify about "what happened between when those drinks were consumed and when those Mason jars were collected by law enforcement, put into those nice paper bags, labeled and sent off to the property unit which a couple of years later the defense attorney says, hey, can I have those tested?" She continued, "What we do know is that [defendant] who testified before you all had talked to his father shortly after these allegations were made by [Bailey] on the phone with his stepdaughter [S.G.]. 'I called a few people. Called my dad.' [']What did your dad do?' 'He's a former [district attorney]. He practices criminal law. We went out for about 45 minutes. We were talking about my feelings and what was going to happen.' Make whatever reasonable inferences that you want to make."

Defendant did not object during defendant's testimony or the prosecutor's closing argument regarding this issue.

---

[11] *Miranda v. Arizona* (1966) 384 U.S. 436.

B. *Forfeiture*

We agree with the Attorney General that defendant forfeited this claim by failing to object at trial. To preserve the claim, defendant was required to object to the prosecutor's comments on this basis. (*People v. Valdez* (2004) 32 Cal.4th 73, 127 (*Valdez*); *People v. Medina* (1995) 11 Cal.4th 694, 756 (*Medina*); *People v. Free* (1982) 131 Cal.App.3d 155, 161 ["Prosecutorial misconduct cannot be raised on appeal absent a specific objection at trial unless any admonition from the trial judge could not have cured the harm done"].) The brevity of the prosecutor's questions and comment during summation--indeed, after the fact of defendant's call to and meeting with his father was first raised by the defense--"indicate that an objection and admonition might have cured any possible harm. Accordingly, defendant may not now raise the issue on appeal." (*People v. Mincey* (1992) 2 Cal.4th 408, 446; see *People v. Collins* (2010) 49 Cal.4th 175, 226-227 ["the reason for the forfeiture rule is that '[i]t is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided' "]; *People v. Earp* (1999) 20 Cal.4th 826, 858-859 ["because any harm could have been cured by an admonition, defendant's failure to make a timely objection and ask the court to admonish the jury precludes him from now challenging as misconduct many of the questions and comments by the prosecutor that he cites as part of an asserted pattern of misconduct"].)

Defendant argues objection was futile because the trial court had overruled other objections made by him. But those objections were not based on the deprivation of the right to counsel.**[12]** The court's rulings on unrelated objections do not demonstrate that a

---

**[12]** Defendant points to his objection to the prosecutor's argument that there was no evidence S.G. had been coached, which the court overruled on the basis that the argument was proper. He also points to his objection of the prosecutor's argument based on a misstatement of the evidence, which the court overruled on the basis that the jury had been instructed that the attorneys' arguments were not evidence.

25

timely and specific objection to the questions and comments he challenges here would have been futile.  (See, e.g., *People v. Powell* (2018) 6 Cal.5th 136, 171 [rejecting the defendant's argument that it would have been futile for him to object again where the court had overruled a previous objection].)

Defendant also argues it is proper for us to decide this issue because it is a pure question of law.  We recognize an exception to the general rule of forfeiture "where the theory presented for the first time on appeal involves only a legal question determinable from facts which not only are uncontroverted in the record, but which could not be altered by the presentation of additional evidence."  (*Redevelopment Agency v. City of Berkeley* (1978) 80 Cal.App.3d 158, 167.)  However, we decline to invoke that exception here.  (See *ibid.* ["whether the general rule shall be applied is largely a question of the appellate court's discretion"].)  As our Supreme Court has stated:  "Defendant . . . fails to identify any authority indicating that forfeiture concerns are irrelevant because his claims concern ' "a pure question of law which is presented by undisputed facts." '  [Citation.] Defendant's interpretation of that exception to the forfeiture rule would seem to imply that any issue reviewable de novo may be raised for the first time on appeal . . . .  Such an exception would allow a defendant to invalidate an entire trial based on a claim of prosecutorial misconduct that could have been easily remedied by a timely objection and an admonition.  We decline to extend the exception to the circumstances presented here, or to excuse the forfeiture as a matter of discretion."  (*People v. Potts* (2019) 6 Cal.5th 1012, 1035-1036.)

IV

*Pervasive Prosecutorial Misconduct Claim*

Defendant raises multiple claims of prosecutorial misconduct, including arguing matters outside the record, vouching, and appealing to passion and prejudice.  Defendant has failed to show reversible error.

26

A. *Arguing Matters Outside the Record Claim*

Defendant argues the prosecutor impermissibly argued facts outside the record during her closing argument when she argued: "What I noticed when [S.G.] was testifying on direct examination is that young lady looks like she had been coached the way she was communicating with [the jury], the faces she was making at [defendant] was deeply concerning to me." Defense counsel objected on the basis that there was no evidence that she had been coached, but the court overruled the objection on the basis that the comment constituted permissible argument.

"A prosecutor commits misconduct by referring in argument to matters outside the record." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1026.) However, " ' " 'a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*People v. Hill* (1998) 17 Cal.4th 800, 819; see *Cunningham*, at p. 1026 ["the prosecution has broad discretion to state its views regarding which reasonable inferences may or may not be drawn from the evidence"].) "A witness's demeanor is ' "part of the evidence" ' and is 'of considerable legal consequence.' " (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1358; see *People v. Mason* (1960) 184 Cal.App.2d 317, 364 [a prosecutor may comment "as to the manner in which a witness testifies"].)

During S.G.'s testimony, the prosecutor informed the court outside the presence of the jury that Detective Strachan had observed S.G. and defendant "making some sort of communications with one another while she is up on the stand." The court and defense counsel agreed that they had noticed defendant smiling, and defense counsel acknowledged that he observed defendant shrug his shoulders when S.G. was struggling to answer a question, which counsel "guess[ed] you could interpret as I don't know the answer to that question either." The court noted that it had seen that as well. Counsel told defendant that he could not communicate with the witness. The court added that it

27

had noticed S.G. "looking at the person asking the question and turning to the jury when providing an answer," which the prosecutor had also observed. Subsequently, S.G. testified on cross-examination that she and defendant had been smiling at each other during her direct examination.

Although anything the *prosecutor* (as opposed to the jury) "noticed" when S.G. was testifying and the fact that it "was concerning" to *her* were irrelevant to the *jury's* assessment of the evidence, when considered together in context, the totality of the prosecutor's comments constitute fair comment on the evidence. The prosecutor's comment that S.G. was making faces at defendant was a fair representation of S.G.'s testimony that she was smiling at defendant. Similarly, the prosecutor's comment that it "looks like [S.G.] had been coached the way she was communicating with [the jury]" was a fair comment on S.G.'s demeanor when testifying, supported by the court's and prosecutor's observation that S.G. frequently "look[ed] at the person asking the question and turn[ed] to the jury when providing an answer." The prosecutor did not suggest that her comments were based on any information outside of the record, as opposed to an inference based on S.G.'s demeanor during her testimony.

B. *Vouching Claim*

Defendant contends Strachan improperly vouched for Bailey during her testimony by testifying at trial consistently with Bailey's testimony and in conflict with her original report. Strachan testified that she wrote in her report that defendant took his hand out of Bailey's pants three times. She wrote that report based on how she perceived the information Bailey provided during their interview on the day of the incident. However, Strachan testified at trial, "So the way I'm hearing it now is that when she answered that he took his hand out, as I'm sitting here it is perceived that he took his hand out the last time. Clearly when I was writing the report I perceived it a different way." Strachan added: "That's just my belief. If I were to make a presumption off of what I have in

28

front of me at this moment in time, that's what I would believe, that it was all a continuous act with small breaks in between."

Defendant forfeited this claim by failing to object at trial. (*Valdez, supra*, 32 Cal.4th at p. 127; *Medina, supra*, 11 Cal.4th at p. 756.) We reject defendant's assertion that objection would have been futile based solely on the trial court's observation that Strachan's report was not the " 'finest police report.' " That comment does not establish futility.[13]

C. *Appealing to Passion and Prejudice Claim*

Defendant contends the prosecutor appealed to the passions of the jury at various times during trial, including while questioning witnesses and during summation. " 'It is, of course, improper to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." ' " (*People v. Redd* (2010) 48 Cal.4th 691, 742.) However, defendant failed to preserve this claim by failing to object to the prosecutor's questions or statements on that basis. (*Id.* at p. 743; see *Valdez, supra*, 32 Cal.4th at p. 127; *Medina, supra*, 11 Cal.4th at p. 756.) While defendant argues that he did not forfeit his claim because "[f]urther objections would have been futile," he points us to no instances in which he objected to any question or statement by the prosecutor on the basis that the prosecutor was appealing to the passions and prejudices of the jury.[14]

---

[13] In footnote 10 of his opening brief, defendant argues that the issue was preserved "as set out in footnote 10 (supra)." That self-referential argument does not establish futility.

[14] Defendant claims the cumulative effect of the prosecutorial misconduct requires reversal. However, because he has failed to establish prosecutorial misconduct, he has also failed to demonstrate that the cumulative effect of such misconduct deprived him of his constitutional rights.

V

*Defense Subpoena and Recalling Bailey*

Defendant contends the trial court erred when it quashed the defense subpoena naming Bailey on the basis that she was immune from service of process as a nonresident witness who had come to the state for purposes of testifying in compliance with a subpoena served by the People. Defendant argues that the People's subpoena was invalid, and Bailey was not immune from service of process because she was in California voluntarily.

Relatedly, defendant contends the trial court abused its discretion when it refused to confer leave to recall Bailey based on a "standard" or "generic" policy, rather than the exercise of informed discretion. He argues recall was necessary to observe Bailey's demeanor when confronted with evidence contradicting her testimony that was presented after she testified, including the absence of defendant's DNA on her breast, testimony regarding her level of impairment following the assault, and a witness's recollection of her sexual relationship with J.

We agree with defendant that the trial court erred when it quashed the defense subpoena, and abused its discretion when it excused Bailey on the basis that defendant did not have her under subpoena. However, we conclude the error was harmless.

A. *Background*

At the time of trial, Bailey lived outside of California. In advance of her testimony, the People issued and served upon her a subpoena compelling her presence and testimony in court, and Bailey acknowledged receipt of the subpoena.

However, because Bailey was a cooperating witness, the People did not comply with the requirements of the Uniform Act to Secure the Attendance of Witnesses from without the State in Criminal Cases (Uniform Act) (§§ 1334 et seq.), which was adopted in 1937 and is the process by which a nonresident witness may be compelled to come to California to testify in a criminal proceeding. "Under the Uniform Act, as adopted in

30

California, when a person located in a sister state that has also adopted the Uniform Act is a 'material witness' in a 'prosecution pending in' California, the judge of the court in which the prosecution is pending 'may issue a certificate . . . specifying the number of days the witness will be required,' which 'shall be presented to a judge of a court of record in the county of such other state in which the witness is found.'  ([§] 1334.3, subd. (a); [citation].)"  "Under the Uniform Act, a sister state court that receives a certificate described in the preceding paragraph must direct the witness named on the certificate to appear at a hearing.  ([§] 1334.2; [citation].)  If at that hearing the sister state court 'determines that the witness is material and necessary, that it will not cause undue hardship to the witness to be compelled to attend and testify' ([§] 1334.2), that 'the laws of the state in which the prosecution is pending' will give the witness protection from arrest while the witness is present, and that the witness will be paid the fees mentioned in the previous paragraph, the court 'shall issue a subpoena . . . directing the witness to attend and testify in the court where the prosecution is pending' [citations]."  (*People v. Cogswell* (2010) 48 Cal.4th 467, 475.)

"If a person comes into this State in obedience to a subpoena directing him to attend and testify in this State, he shall not, while in this State pursuant to the subpoena or order, be subject to arrest or the service of process, civil or criminal, in connection with matters which arose before his entrance into this State under the subpoena."  (§ 1334.4.)

On August 5, after defense counsel had completed his cross-examination of Bailey, counsel asked that she be subject to recall, noting that she had been served a subpoena.  The prosecutor indicated that was an issue the parties would have to address subsequently.

In a motion filed on August 8, defendant claimed he had served Bailey with a subpoena following completion of her cross-examination, and sought to determine the validity of that service.  The motion asserted that because the People failed to comply with the Uniform Act's provisions when serving Bailey, her presence in California was

31

not in compliance with a valid subpoena, and therefore she was not immune from service of process under section 1334.4. The prosecutor recognized in the subsequent hearing that she had not complied with the Uniform Act's provisions because Bailey was a cooperative witness, but asserted that Bailey was immune from service of process under section 1334.4 because she had been served a subpoena, she acknowledged receipt thereof, and she had come to California for the sole purpose of testifying at the trial.

The trial court excused Bailey. It stated that if the defense "want[ed] her here, you get her on your own subpoena," adding that it does not "hold somebody subject to recall on a subpoena issued by somebody else when they've already had the opportunity for Cross-Examination." Defense counsel added that he did not have Bailey's contact information, but otherwise informed the court that he had nothing else he wanted to raise on the issue.

The following day, the trial court concluded that Bailey was immune to service of the defense subpoena. The court recognized that its ruling was guided by the Uniform Act, but it found no authority on the issue of whether failure to comply with the Uniform Act's procedural requirements waived the immunity to process provided by section 1334.4. Noting the common law rule in civil cases that witnesses are immune to process (see *Gerard v. Superior Court* (1949) 91 Cal.App.2d 549, 552 [nonresidents who come to the state to testify in judicial proceedings are immune from service of civil process while attending hearing] and *Franklin v. Superior Court* (1950) 98 Cal.App.2d 292, 294 [purpose of rule exempting testifying witnesses from process is to allow the party to participate in the hearing and leave the jurisdiction]),[15] the court determined that Bailey

---

[15] The court recognized an exception to the general rule, not applicable in this case, where the party initiated the litigation against a California resident, thereby availing themselves of the benefits of the State of California for litigation purposes. (See *Slosberg v. Municipal Court of Los Angeles* (1950) 101 Cal.App.2d 238, 240-241.)

was immune to process because: (1) she was issued a subpoena commanding her appearance in California, and (2) in submission thereto, she came to California for the purpose of testifying. The court determined that while the common law immunity rule developed in civil, and not criminal, cases, the purpose of immunity underlying the Uniform Act remained the same, and it would not be appropriate to permit a collateral attack on a subpoena with which Bailey had complied. Accordingly, the court quashed the subpoena "to the extent the [prosecutor] has legal authority to quash a subpoena on behalf of a witness," and, in the event the prosecutor did not have that authority, declined to enforce the defense subpoena if Bailey failed to subsequently appear for further testimony. The court added that there was no due process violation because Bailey had already been subject to cross-examination in the ongoing trial.

B. *Quashing the Subpoena*

Defendant contends the trial court improperly quashed the subpoena he served on Bailey following her cross-examination. He argues that because the People failed to comply with the procedural requirements of the Uniform Act, the People's subpoena was invalid, and Bailey was not immune from service of process under section 1334.4. The Attorney General does not argue that Bailey was immune from service of process under section 1334.4, instead arguing that the trial court properly quashed the subpoena because defendant was able to cross-examine Bailey, and whatever testimony Bailey would have provided in response to defendant's subpoena would have been needlessly cumulative. Defendant has the better argument.

At the outset, the plain language of the Uniform Act does not support immunity here. The Uniform Act establishes a detailed procedure for securing the presence of nonresident witnesses. (See §§ 1334-1334.6.) In the absence of compliance with those procedures, the Uniform Act does not confer immunity on a nonresident witness who attends an out-of-state judicial proceeding. (See, e.g., *State v. Brown* (Wash. 1949) 213 P.2d 305, 384 [State's uniform act "confers immunity only where a proper certificate is

33

issued by a court of record in this state and presented to a judge of a court of record in the county of the other state in which the witness is found"]; *State v. New* (S.D. 1995) 536 N.W.2d 714, 717 [witness not subject to immunity under South Dakota's uniform act because " 'subpoena' " issued to nonresident witness did not comply with act's provisions]; *In re Schuler* (Super.Ct.App.Div  1972) 120 N.J. Super. 79, 83 [witness not immune from service where a prosecutor did not comply with the procedures provided by the state's uniform act, but rather merely "request[ed]" that the nonresident witness appear in the state to testify].)

The trial court appears to have concluded that Bailey was immune to service under the Uniform Act based on public policy considerations underlying civil common law immunity.  At common law, the general rule was "that nonresidents of a state who come within the territorial limits of the state as parties litigants or to testify as witnesses in judicial proceedings are afforded an immunity or privilege from the service of civil process while in actual attendance at the hearing and during such reasonable time as may be consumed in going to, and returning from, the place of trial." (*Gerard v. Superior Court, supra*, 91 Cal.App.2d at p. 552.)  The general rule was originally founded upon the convenience of the court.  (*Lamb v. Schmitt* (1932) 285 U.S. 222, 225.)  "As commonly stated and applied, it proceeds upon the ground that the due administration of justice requires that a court shall not permit interference with the progress of a cause pending before it, by the service of process in other suits, which would prevent, or the fear of which might tend to discourage, the voluntary attendance of those whose presence is necessary or convenient to the judicial administration in the pending litigation." (*Ibid.*) However, subsequent courts "increasingly have emphasized the interest advanced by the voluntary appearance of a nonresident who could not otherwise be made to testify.  In such cases, immunity is an inducement to the witness to appear and is said to be his substantive right." (*Velkov v. Superior Court* (1953) 40 Cal.2d 289, 292.)

There are exceptions to this general rule. The *Lamb* court cautioned that immunity "should not be enlarged beyond the reason upon which it is founded, and that it should be extended or withheld only as judicial necessities require" (*Lamb v. Schmitt*, *supra*, 285 U.S. at p. 225), and it determined that the test for granting or withholding immunity was "whether the immunity itself, if allowed, would so obstruct judicial administration in the very cause for the protection of which it is invoked as to justify withholding it" (*id.* at p. 228). Along those lines, California courts have recognized the following exception to the general rule: "[T]he nonresident is not exempt if the suit brought against him involves matters affecting the 'same correlated subject-matter, and the action is brought in good faith and calls for the adjudication of substantial rights.' " (*Russell v. Landau* (1954) 127 Cal.App.2d 682, 689 [exception did not apply because second action "[was] not akin" to the first]; *St. John v. Superior Court* (1960) 178 Cal.App.2d 794, 797-798 [exception to granting of immunity "where second action, in which immunity is claimed 'arises out of or involves the same subject matter as the one in which the nonresident has made a voluntary appearance' "]; see also *Moffett v. Arabian American Oil Co.* (S.D.N.Y. 1948) 8 F.R.D. 566, 567 [nonresident who came to the state to testify in deposition was not immune to service of subpoena requiring testimony at trial on the same case that was the subject of the deposition; general rule of immunity "does not extend to process which is served in furtherance of the administration of justice in the very cause in connection with which the suitor or witness has come into the jurisdiction"]; *Roth v. W T Cowan, Inc.* (E.D.N.Y. 1952) 103 F.Supp. 203, 204 [nonresident witness in the state under subpoena for the taking of his deposition not immune to service of summons and third-party complaint where the second suit was akin to an interlocutory motion to compel production of documents in the first suit, and the suits "are not independent of each other or unrelated"].)

Here, the public policy underlying the common law rule of immunity to service of process for nonresident witnesses did not apply because the defense subpoena involved

35

not only the same subject matter, but the very same cause in which Bailey had come to the state to testify. There is nothing to suggest the defense subpoena of Bailey would interfere with the administration of justice; rather, the administration of justice was potentially interfered with only by the decision to decline to enforce the subpoena. Accordingly, we conclude the trial court erred when it found Bailey was immune to service of the defense subpoena under the Uniform Act.

In a related argument, defendant contends the trial court abused its discretion when it excused Bailey, violating his federal constitutional right to confront witnesses against him, because it relied on a standard policy of not recalling witnesses that had been subject to cross-examination, and did not evaluate his reasons for desiring further cross-examination. But when excusing Bailey, the trial court stated, "if you [the defense] want her here, you get her on your own subpoena," indicating that the court would have made Bailey available for recall had it served her with a valid subpoena. Accordingly, the court did not err by excusing Bailey pursuant to a standard policy, but rather by refusing to hold her subject to recall on the basis that defendant had not served her with a valid subpoena.

C. *Harmless Error*

Defendant contends the trial court's error in quashing the subpoena requires reversal because it was reasonably probable that he would have achieved a more favorable result had the jury been given the opportunity to observe Bailey's demeanor as she responded to questions that called her version of events into doubt. (*People v. Watson* (1956) 46 Cal.2d 818, 836-837.) However, we conclude that defendant already had the opportunity to cross-examine Bailey about each of the topics he now asserts he would have asked her about on recall, and there is no reasonable probability of a more favorable result had he been able to inquire into those topics again.

During cross-examination, defendant asked Bailey whether she was "aware of the fact that my client's DNA was not found on either of your breasts?" Bailey replied,

36

"No." Defense counsel sought to further inquire about Bailey's understanding of the DNA evidence in the case, but the court sustained the People's hearsay objection to Bailey's testimony about what she had been told about the DNA evidence. Accordingly, defense counsel had the opportunity during cross-examination to lay a foundation for Bailey's understanding of the DNA evidence, but he was unable to do so. Moreover, the jury heard evidence after Bailey's testimony that defendant's DNA was not found on Bailey's breast. There is no reasonable probability that recalling Bailey to ask her the same question she had already been asked, when the jury had already heard evidence supporting the fact defendant sought to establish, would have led to a more favorable result for defendant. The jury was capable of resolving conflicts in the evidence and making credibility determinations based on the evidence before it. (*People v. Edwards* (1960) 185 Cal.App.2d 589, 590.)

Defendant next asserts that he would have asked Bailey to react to testimony from K.H., who testified that Bailey had told her that she had engaged in intimate behavior with J., which she agreed meant "[a]nything beyond platonic interactions," although she did not know the details. She then testified that she was aware Bailey and J. had engaged in sexual activities including digital penetration, oral sex, and "stuff in that realm." But defense counsel asked Bailey during cross-examination whether she told Holtz she was involved in a sexual relationship with J. Bailey answered, "I don't remember telling her I was involved. I have said that I wanted to be at one point in time." Recalling Bailey to ask her again about her relationship with J., or what she had told Holtz about that relationship, is repetitive and cumulative, and not reasonably probable to lead to a more favorable result for defendant.

Finally, defendant asserts that he would have questioned Bailey about her level of impairment at the time of the assault in light of testimony from other witnesses that she did not appear impaired in the hours after the assault occurred. But like the other evidence, defendant had the opportunity to, and did, question Bailey about her level of

37

impairment at the time of the assault. The jury was able to observe her demeanor during her testimony, was able to view the demeanor of other witnesses while they testified about their recollection of Bailey's level of impairment, and could resolve conflicting evidence for the purpose of making credibility determinations.

## VI

### DNA Evidence Claim

Defendant contends the trial court abused its discretion by admitting evidence of the Y-STR DNA testing conducted on Bailey's shorts and underwear. Defendant argued in a motion in limine seeking to exclude the evidence, and again on appeal, that the evidence could not conclusively demonstrate that the haplotype detected in Bailey's underwear and shorts was *his* DNA, as opposed to another member of his patrilineal line, and that the evidence did not inform how the DNA came to be found on Bailey's clothing.[16] We see no error.

A. *Procedural Background*

The People argued in opposition to defendant's motion in limine seeking exclusion of the Y-STR DNA evidence that the evidence was relevant because defendant could not be excluded as the source of the DNA, and the haplotype detected in the three samples from Bailey's underwear and shorts would be expected in only 1 of 807 members of the Caucasian subpopulation. The opposition recognized that Y-STR DNA evidence could not distinguish between the members in a patrilineal line, which could assist in exonerating defendant if there were evidence that Bailey had interactions with

---

[16] Defendant's motion in limine further argued the evidence should be excluded pursuant to Evidence Code section 352, which provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The trial court denied defendant's motion on this basis, and defendant does not challenge that ruling on appeal.

other members of defendant's patrilineal line, but there was no evidence of such contact. Rather, the evidence corroborated Bailey's allegation that defendant sexually assaulted her.

At an evidentiary hearing on defendant's motion, defendant's father testified that he was inside defendant's house at least once per week, and he had regularly seen his other son--defendant's brother--in the house.

Sicher testified at the hearing. She set out the results of the Y-STR DNA testing she performed consistently with her testimony at trial, which we recounted *ante*. Sicher recognized that Y-STR DNA testing was less discriminating than typical autosomal DNA analysis because a haplotype is inherited as a set, meaning a father and his biological sons will all have the same haplotype, barring a mutation. Accordingly, she could not conclusively determine that the DNA she analyzed belonged to defendant, as opposed to another member of his patrilineal line. She testified, however, that she "[did not] consider [the evidence to be] insignificant" because it was "able to exclude lots of other people."

Sicher further testified that she could not determine (in this case, or in any other) how the DNA she tested was deposited in the location where she retrieved it for analysis. However, she considered it to be unlikely that DNA present on a couch would transfer to the interior of a woman's underwear if she wore shorts over the underwear. In her view, "[U]nless someone is sitting in something wet or touches something wet and then goes into their underwear, I don't see how, it doesn't seem obvious how something would go from the outside surface of an object like a couch to, through two layers of clothing. It just seems rather unlikely."

Dr. Miller testified for the defense. He agreed with Sicher that Y-STR DNA evidence could not distinguish between defendant, his brother, or his father, and that analysts cannot determine how the DNA was transferred or where it came from. He also agreed that the amount of DNA found in Bailey's underwear would not result from a

direct transfer of DNA from the couch she sat on, but that a transfer of DNA could have occurred in multiple ways and from any surface that had defendant's DNA on it.

The trial court denied the motion to exclude on the basis that the evidence was relevant and not inadmissible under Evidence Code section 352. It recognized that Y-STR DNA test results are not as "statistically discriminating autosomal STR results," but noted that the DNA evidence was not the only evidence being used to establish the perpetrator's identity because Bailey would testify that defendant was the perpetrator. Additionally, defendant would have the opportunity to cross-examine witnesses about the evidence, and the jury would be able to assess its weight.

B. *Legal Background*

"Except as otherwise provided by statute, no evidence is admissible except relevant evidence. (Evid. Code, § 350.) Relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact . . . .' (*Id.*, § 210.) The trial court is vested with wide discretion in determining the relevance of evidence. [Citation.] The court, however, has no discretion to admit irrelevant evidence. [Citation.] 'Speculative inferences that are derived from evidence cannot be deemed to be relevant to establish the speculatively inferred fact in light of Evidence Code section 210, which requires that evidence offered to prove or disprove a disputed fact must have a tendency in reason for such purpose.' " (*People v. Babbitt* (1988) 45 Cal.3d 660, 681.)

When the relevance of proffered evidence depends on the existence of a preliminary fact, the proponent of the evidence has the burden of producing evidence of the preliminary fact, and the proffered evidence is inadmissible unless the court finds the fact has been established. (Evid. Code, § 403, subd. (a)(1).)[17] The preliminary fact

---

[17] Evidence Code section 403 provides in relevant part: "(a) The proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is inadmissible unless the court finds that

40

requires proof by a preponderance of the evidence. (*People v. Anthony O.* (1992) 5 Cal.App.4th 428, 433; *People v. Herrera* (2000) 83 Cal.App.4th 46, 50.) "The court should exclude the proffered evidence only if the 'showing of preliminary facts is too weak to support a favorable determination by the jury.' " (*People v. Lucas* (1995) 12 Cal.4th 415, 466.) On appeal, the decision whether the foundational evidence satisfies the standard is reviewed for abuse of discretion. (*Ibid.*)

C. *Analysis*

Defendant contends the Y-STR DNA evidence was inadmissible because the prosecution failed to satisfy its burden to prove by a preponderance of the evidence the preliminary fact that the haplotype in the tested sample came from him, asserting that there is a 66 percent chance that the source of the DNA was his father or brother, and only a 33 percent chance it came from him. He further argues that the prosecution could not show how the DNA in the tested samples came to be found in Bailey's clothing.

In support of his argument, defendant attempts to distinguish the facts here from those in *People v. Stevey* (2012) 209 Cal.App.4th 1400. There, the victim alleged that the defendant penetrated her vagina, but acknowledged that she also had a consensual sexual partner. The defendant had blond hair, and her partner did not. Blond hairs were collected from the victim's vagina, and DNA evidence extracted from those hairs corroborated the victim's allegation that the defendant had had sexual intercourse with her. The defendant argued that the trial court erred by not conducting a *Kelly*[18] hearing

---

there is evidence sufficient to sustain a finding of the existence of the preliminary fact, when: [¶] (1) The relevance of the proffered evidence depends on the existence of the preliminary fact; [¶] (2) The preliminary fact is the personal knowledge of a witness concerning the subject matter of his testimony; [¶] (3) The preliminary fact is the authenticity of a writing; or [¶] (4) The proffered evidence is of a statement or other conduct of a particular person and the preliminary fact is whether that person made the statement or so conducted himself."

[18] *People v. Kelly* (1976) 17 Cal.3d 24.

to determine whether Y-STR DNA testing had gained general acceptance in the relevant scientific community. (*Id.* at p. 1410.) The court noted the method's limitations--which we discussed, *ante*--but observed, "The fact that Y-STR DNA testing cannot positively identify an individual does not mean the test is a new technique, that it is unreliable, or that the results are not probative." (*Id.* at p. 1414.) Instead, the court recognized: "The [court in *State v. Calleia* (N.J. Super. 2010) 997 A.2d 1051] analogized the results of Y-STR testing to conventional forms of evidence routinely admitted in criminal trials, such as shoe imprint evidence. Evidence of shoe imprints found at a crime scene is routinely admitted, the court observed, to connect a criminal defendant with shoes found in his possession, 'despite the fact that any number of persons might own identical pairs of shoes.' (*Calleia*, *supra*, 997 A.2d at p. 1066.) The prosecution was not required to prove that the defendant's shoes were the only ones that could have made the impressions; rather, the jury was provided the opportunity to weigh their probative value. In the same way, the probative value of the Y-STR is a question of the weight of the evidence, not its admissibility. ([*Calleia*], at pp. 1066-1067.)" (*Ibid.*)

Defendant contends the Y-STR DNA evidence is irrelevant because, unlike the blond hairs in *Stevey*, there is no evidence tying the analyzed DNA to him, "other than by speculation." Extending the shoe print analogy discussed in *Stevey*, he argues that such shoe print evidence would be irrelevant to establish identity if the shoe prints led to a house in which three individuals all wore the same shoes.

We disagree. The Y-STR DNA evidence was relevant because defendant could not be excluded as the source of the Y-STR DNA evidence that was found in Bailey's underwear and shorts, which justified a reasonable inference that defendant was the source of the DNA. Returning to the shoe print evidence analogy discussed in *Stevey*, while evidence that a shoe print was left at a crime scene cannot conclusively establish the identity of the perpetrator on its own, it is relevant to support the testimony of an eyewitness who observed a perpetrator committing a crime. That is true even if other

42

individuals living with the perpetrator all wore the same shoes, because the relevance of the evidence is to corroborate the eyewitness identification of the perpetrator, not to determine the identity of the perpetrator among the house's residents. In that hypothetical, as here, the jury would be entitled to determine the weight of the evidence.

For similar reasons, we reject defendant's argument that the Y-STR DNA evidence was irrelevant because the analysts could not testify about how the DNA evidence came to be found in Bailey's clothing. Evidence is not irrelevant simply because there are innocuous explanations for the existence of the evidence. Defendant was entitled to--and did--question the expert witnesses about the possibility that defendant's haplotype was deposited in Bailey's clothing in a way other than defendant physically touching the location where the evidence was found. But that does not eliminate the reasonable inference that defendant's haplotype was found on Bailey's clothing because he touched that part of Bailey's clothing during a sexual assault.

VII

*Lesser Included Offenses Claim*

The trial court has a duty to instruct the jury sua sponte on all lesser included offenses if there is substantial evidence from which a jury could reasonably conclude the defendant committed the lesser, uncharged offense, but not the greater charged offense. (*People v. Smith* (2013) 57 Cal.4th 232, 239; *People v. Rogers* (2006) 39 Cal.4th 826, 866.) Defendant contends the court had a duty to instruct sua sponte on the lesser included offenses of attempted sexual penetration by force (§§ 664, 289, subd. (a)(1)), assault with intent to commit sexual penetration by force (§§ 220, subd. (a), 289, subd. (a)(1)), simple battery (§ 242), and simple assault (§ 240). We disagree.

On appeal, we independently review whether the trial court erred in failing to instruct on a lesser included offense. (*People v. Booker* (2011) 51 Cal.4th 141, 181.) In making this determination, we view the evidence in the light most favorable to the defense (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137), and we do not

43

evaluate the credibility of witnesses (*People v. Breverman* (1998) 19 Cal.4th 142, 162). " '[T]he existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury. [Citations.] "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]' " that the lesser offense, but not the greater, was committed.' " (*People v. Moye* (2009) 47 Cal.4th 537, 553.)

Defendant contends substantial evidence supports the finding that he attempted to penetrate, but failed to or was prevented from doing so, because Dr. Miller testified it is "relatively certain" that Bailey's DNA would have remained under his fingernails at the time of his SART exam if his finger had penetrated Bailey's vagina. Not so. First, Bailey was not *excluded* as the minor contributor of DNA found under defendant's fingernails; Sicher was simply unable to interpret the sample because there was more than one minor contributor. Second, no evidence supported a finding that defendant intended to, but failed to or was prevented from, digitally penetrating Bailey. Bailey testified that defendant completed the digital penetration, and defendant testified that no sexual contact occurred. There was no testimony to support the finding that defendant intended to commit the crime and attempted to do so, but was unable or prevented from doing so. Given the absence of any testimony supporting an attempt instruction, the court was not required to give one.

Defendant also argues that the jury could have reasonably found that defendant committed simple battery by touching her in a non-sexual way that woke her up. Substantial evidence does not support a finding that defendant's act of pushing Bailey's legs off him constituted an unlawful touching. (See *People v. Chenelle* (2016) 4 Cal.App.5th 1255, 1265.)

44

# DISPOSITION

The judgment is affirmed.

                                        /s/
                                      Duarte, J.

We concur:

/s/
Hull, Acting P. J.

/s/
Renner, J.